IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BECON MEDICAL, LTD.** and **HENRY STEPHENSON BYRD, M.D.,** Plaintiff, | **CIVIL ACTION** |
| v. | |
| **SCOTT P. BARTLETT, M.D.,** and **TALEXMEDICAL, LLC,** Defendants. | **NO. 18-4169** |

DuBois, J.                                                                                              August 22, 2019

# MEMORANDUM

## I.  INTRODUCTION

This patent infringement case involves two non-surgical infant ear correction devices: plaintiffs' EarWell and defendants' InfantEar. Plaintiffs Becon Medical, Ltd., and Henry Stephenson Byrd, M.D., assert that defendants TalexMedical, LLC, and Scott P. Bartlett, M.D., infringed on patents related to EarWell by, *inter alia*, making and selling InfantEar. There are two patents-in-suit: plaintiffs' U.S. Patent No. 8,167,942 ("'942 Patent") and U.S. Patent No. 8,852,277 ("'277 Patent") (collectively, "the Patents"). Presently before the Court are the parties' claim construction briefs. The parties dispute three claim terms used in the Patents: "opening," "scaphal mold," and "cradle." Having conducted a *Markman* Hearing on July 12, 2019, the Court now construes the disputed claim terms.

## II.  BACKGROUND[1]

Plaintiffs Dr. Henry Stephenson Byrd and Becon Medical, Ltd., invented and developed an infant ear correction device called EarWell, which corrects a variety of ear deformities in infants. *See* Am. Compl. ¶¶ 13, 15. Thereafter, defendants Dr. Scott P. Bartlett and

---

[1] The facts as set forth in this section are taken from plaintiffs' Amended Complaint and are provided only as is relevant to the Court's opinion.

TalexMedical, LLC, developed their own non-surgical infant ear correction device called InfantEar. *Id.* ¶¶ 20–21.

The U.S. Patent and Trademark Office has issued several patents related to EarWell to plaintiffs, including the two patents-in-suit: (1) the '942 Patent, issued on May 1, 2012, and (2) the '277 Patent, issued on October 7, 2014. *Id.* ¶¶ 14, 22–23. The '942 Patent relates to the "ear molding device," also called the "retractor," which is made up of the "scaphal mold" and "one or more braces." *See* Pl. Op. Br. 2–3; U.S. Patent No. 8,167,942 ("'942 Patent") col. 10 l. 19–34 (filed May 1, 2012). The '277 Patent relates to the "ear molding device" from the '942 Patent, combined with a "cradle." *See* Pl. Op. Br. 2; U.S. Patent No. 8,852,277 ("'277 Patent") col. 10 l. 28–49 (filed Oct. 7, 2014).

On September 27, 2018, plaintiffs filed the Complaint (Document No. 1); on November 14, 2018, plaintiffs filed the Amended Complaint (Document No. 12). Plaintiffs assert in the Amended Complaint that defendants infringed on plaintiffs' '942 and '277 Patents by "making, importing, using, selling, and/or offering to sell" InfantEar. Am. Compl. ¶ 27. On December 11, 2018, defendants filed the Answer to the Amended Complaint, asserting counterclaims of non-infringement and invalidity (Document No. 15). Plaintiffs filed their Answer to defendants' counterclaims on December 31, 2018 (Document No. 18).

On April 5, 2019, the Court held a Technology Tutorial, at which the parties demonstrated and explained their respective devices. Pursuant to the Court's April 5, 2019 Order, the parties submitted a joint claim construction chart on April 12, 2019 (Document No. 33), setting forth their proposed constructions for three claim terms in dispute: (1) "opening" in the '277 Patent, (2) "scaphal mold" in the '942 and '277 Patents, and (3) "cradle" in the '277 Patent. On May 3, 2019, plaintiffs filed their Opening Claim Construction Brief (Document No.

37). Defendants responded on May 31, 2019 (Document No. 40). Plaintiffs filed a reply on June 28, 2019 (Document No. 53), and on July 3, 2019, defendants filed a sur-reply (Document No. 57). On July 12, 2019, the Court held a *Markman* Hearing during which the parties presented oral argument on the proper construction of the disputed claim terms. The Court now construes those terms.

### III.     LEGAL STANDARD

Construction of disputed patent claims is a question of law and is therefore the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388–91 (1996). The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). The Court is not bound by the proposed constructions presented and argued by the parties. *See Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 n.4 (Fed. Cir. 2012) (en banc).

In interpreting claims, it is "well-settled" that "the court should look first to the intrinsic evidence of record." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Id.* There are three primary sources of "intrinsic evidence": (1) the claims, (2) the specification, and (3) the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

First, a court must examine the language of the claims, as "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "[W]ords of a claim 'are generally given their

ordinary and customary meaning'"—that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312–13 (quoting *Vitronics*, 90 F.3d at 1582). In examining the claims of the patent, both "the context in which a term is used in the asserted claim" and "[o]ther claims of the patent in question" "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. "Differences among claims also can be a useful guide in understanding the meaning of particular claim terms." *Id.* For example, under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

The second source of intrinsic evidence is the patent specification, which "contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." *Markman*, 52 F.3d at 979. "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." *Phillips*, 415 F.3d at 1316. For example, the specification may reveal "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess" or "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

The third source of intrinsic evidence is the patent's prosecution history, which consists of "the complete record of the proceedings before the [U.S. Patent and Trademark Office ("PTO")] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. Like the specification, the prosecution history may be useful in revealing a special

meaning assigned by the patentee to the term or a disclaimer clarifying what the claims do not cover. *Id.* That said, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is [typically] less useful for claim construction purposes." *Id.*

Although the intrinsic record is most "significant . . . in determining the legally operative meaning of claim language," extrinsic evidence may also "shed useful light" on claim construction. *Id.* (internal citation omitted). "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. "Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Phillips*, 415 F.3d at 1318.

Finally, there is no precise formula for how a court should weigh the different sources of evidence. Nor is "[t]he sequence of steps used by the judge in consulting various sources . . . important." *Id.* at 1324. Instead, "in weighing all the evidence bearing on claim construction, the court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly." *Id.* at 1319, 1324 ("[W]hat matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.").

## IV. DISCUSSION

The parties dispute the construction of three claim terms: (1) "opening," as it is used in

5

the '277 Patent, (2) "scaphal mold," as it is used in the '942 and '277 Patents, and (3) "cradle," as it is used in the '277 Patent. The Court will analyze each disputed claim term in turn.

### A. "Opening" in '277 Patent

The parties propose the following constructions for the term "opening":

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction is necessary. Alternatively: "A gap" | "Gap that allows passage through a member from an anterior to a posterior surface of the member" |

The term "opening" appears in the '277 Patent. Claim 1 of the '277 Patent provides:

> a cradle comprising:
>     a base section defining an *opening* dimensioned to accommodate the passage of the ear through the *opening*, the base section including a posterior surface and an anterior surface;

'277 Patent col. 10 l. 32–36 (emphasis added).

Plaintiffs first contend that the term "opening" need not be construed, because its meaning is "readily ascertainable on its face." *See* Pls. Reply 1. Plaintiffs further argue that regardless of which party's construction the Court adopts, defendants have infringed. *See* Pls. Op. Br. 7. Defendants maintain that the construction of "opening" is relevant to their non-infringement defense. *See* Markman Hr'g Tr., July 12, 2019, ECF No. 66, 23:19–23, 25:9–11. The Court rejects plaintiffs' argument that construing the term "opening" is unnecessary.

Alternatively, plaintiffs ask the Court to construe "opening" based on its plain meaning, "a gap," that, as Claim 1 provides, "accommodate[s] the passage of the ear." *See* Pls. Op. Br. 7; Markman Hr'g Tr. 9:24–10:6.

Defendants argue that plaintiffs' construction would unduly broaden the claim. *See* Defs. Resp. 24. They contend that a construction more faithful to the '277 Patent is

"gap that allows passage through a member from an anterior to a posterior surface of the member." *See id.* at 18. According to defendants, "member" can refer to either the base section or the adhesive backing of the device, as the '277 Patent refers to separate openings in each of these components. *See id.* at 19; Markman Hr'g Tr. 27:17–25.

At the outset, the Court rejects the introduction of a new term, "member," into the Patent. The Federal Circuit has emphasized that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). The Court concludes that including "member" in the construction would only add confusion to the claims.

The central dispute between the parties hinges on the question whether directional language is necessary to the construction of "opening." Defendants argue that the only type of opening contemplated by the '277 Patent is one that permits passage of the ear "from an anterior to a posterior surface" of the base section and/or adhesive backing—in other words, the passage through the opening moves perpendicularly to the surfaces of the device. *See* Markman Hr'g Tr. 28:15–29:2. According to defendants, this perpendicular movement stands in contrast to the lateral movement of the ear into the opening in their product, InfantEar. *See* Defs. Resp. 28. Defendants argue that their proposed directional language is supported by the intrinsic evidence. For example, the specification of the '277 Patent states, *inter alia*, that the "cradle base [] has a posterior surface [] that includes an opening [] through which the ear can be positioned within the compartment defined by the base and cover" and that the opening in the "adhesive backing" aligns with the opening in the "cradle base" to accommodate passage of the ear. *See* '277 Patent col. 4 l. 55–64. Defendants maintain that the directional language they propose, from "anterior"

7

to "posterior," is vital to ensure that those the openings in the base section and the adhesive backing align to "accommodate the passage of the ear."  *See* Defs. Resp. 22–23.

Plaintiffs argue that defendants' directional requirement is too limiting, because their construction would require a jury to consider the direction in which the device was installed on the ear.  *See* Pls. Reply 3–4.  According to plaintiffs, defendants' construction of the term "opening" could prove problematic when applied to an embodiment of plaintiffs' device with a C- or U-shaped opening.  *Id.*; Markman Hr'g Tr. 21:15–22:11.  Specifically, they explain that under defendants' construction, an "opening" would be an "opening" only when a clinician first passes the ear through the bottom of the base and then the top of the base but not when a clinician slides the base behind the ear from left to right, as may be the case in a C- or U-shaped device.  Pls. Reply 3–4; Markman Hr'g Tr. 21:15–22:11.  Plaintiffs assert that the opening "can be different shapes so long as it accommodates the passage of the ear."  *See* Pl. Op. Br. 8.  Defendants do not dispute that the opening in plaintiffs' device can be any shape.[2]  *See* Defs. Resp. 26.

The Court agrees with plaintiffs.  Construing "opening" to require a directional component is likely to confuse a jury and complicate the understanding of the Patent, particularly in the context of a C- or U-shaped opening.

Moreover, "opening" is a "commonplace word" which "[l]ay jurors can be expected to use . . . in the same manner as would a person of ordinary skill in the art."  *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 38 F. Supp. 3d 589, 608 (E.D. Pa. 2014); *see also Performance Pricing, Inc. v. Google Inc.*, No. 07-432, 2009 WL 2497102, at *7 (E.D. Tex. Aug.

---

[2] The Court notes that defendants dispute that plaintiffs' C-shaped device is covered by their own patents.  *See* Markman Hr'g Tr. 106:3–4 ("I don't believe the plaintiffs' device is covered by their own patent.").

13, 2009) ("The term is not confusing because the lay meaning of this term is the same meaning as that which a person having ordinary skill in the art would attribute to the term."), *aff'd sub nom. Priceplay, Inc. v. Google, Inc.*, 410 F. App'x 325 (Fed. Cir. 2011). Where "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges . . . claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." *See Phillips*, 415 F.3d at 1314.

The ordinary meaning of "opening" is "a gap." The Court concludes that "opening" is used consistent with its ordinary meaning in the '277 Patent. The only requirement added by the '277 Patent, on which both parties agree, is that the opening must accommodate the passage of the ear. *See* '277 Patent col. 10 l. 33–35 ("an opening dimensioned to accommodate the passage of the ear through the opening"); Pls. Op. Br. 7; Defs. Resp. 23. Additional construction "would only introduce confusion and ambiguity into a clear and unambiguous phrase." *See Comcast Cable Commc'ns*, 38 F. Supp. 3d at 608 (quoting *Callpod, Inc. v. GN Netcom, Inc.*, No. 06-4961, 2009 WL 590156, at *7 (N.D. Ill. March 6, 2009)).

For these reasons, the Court construes "opening" as "a gap that accommodates the passage of the ear."

### B. "Scaphal Mold" in '942 and '277 Patents

Next, the Court must construe "scaphal mold." The parties propose the following constructions:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction is necessary. Alternatively: (1) "The distal end of the one or more braces," or (2) "Mold at the end of the one or more braces that is positionable in the scaphal area" | "Mold for scapha or scaphoid fossa (scapha)" |

The term "scaphal mold" is used in both the '942 Patent and the '277 Patent. The '942

9

Patent covers an "ear molding device" that is made up of the "scaphal mold" and "one or more braces." '942 Patent col. 10 l. 19–34. Specifically, claim 1 of the '942 Patent provides:

> A molding device for a human ear, . . . the molding device comprising:
> one or more braces; and
> a *scaphal mold* supported by the one or more braces, wherein the one or more braces and the *scaphal mold* are constructed to retain the helix and the helical rim within a space defined between the one or more braces and the *scaphal mold*, and further constructed to maintain a substantially correct anatomical shape of the helix and the helical rim, wherein the *scaphal mold* and one or more braces are constructed to mold the helix and helical rim during their growth such that the growth of the helix and helical rim conforms to the space between the *scaphal mold* and the one or more braces.

*Id.* col. 10 l. 19–34 (emphasis added). Similarly, claim 1 of the '277 Patent provides:

> an ear molding device comprising:
> one or more braces; and
> a *scaphal mold* supported by the one or more braces, wherein the one or more braces and the *scaphal mold* are adapted to retain the helix and the helical rim within a space defined between the one or more braces and the *scaphal mold*, and to maintain a substantially correct anatomical shape of the helix and the helical rim.

'277 Patent col. 10 l. 42–49 (emphasis added).

Plaintiffs first contend that no construction is necessary, because "scaphal mold" is not relevant to defendants' non-infringement position. Pls. Reply 1. Defendants disagree. They assert that InfantEar does not have a "scaphal mold" under their construction because, in InfantEar, silicone gel molds the scapha, rather than a "scaphal mold." *See* Defs. Sur-Reply 1; Markman Hr'g Tr. 69:7–18. The Court agrees with defendants that construction of "scaphal mold" is relevant to defendants' non-infringement positions.

Alternatively, plaintiffs offer two constructions: (1) "the distal end of the one or more braces," or (2) "mold at the end of the one or more braces that is positionable in the scaphal area," "[i]f the Court believes that a factfinder would better understand" this construction. Pls. Op. Br. 10; Pls. Reply 5, 6 n.3. Plaintiffs contend that the term "scaphal" refers to where the

scaphal mold is placed—the scaphal area of the ear. *See* Pls. Reply 5. Plaintiffs further explain that their construction also describes the scaphal mold's positioning relative to the other component of the ear molding device, the one or more braces. *See* Pls. Op. Br. 11–12; Pls. Reply 6.

Defendants' proposed construction is "mold for scapha or scaphoid fossa (scapha)." *See* Defs. Resp. 3. In support, defendants cite portions of the Patents' specifications which state that the scaphal mold is "configured to mold the scaphoid fossa" and that it "generally has a rounded edge for contacting the skin in the scaphoid fossa." *See id.* at 5–6 (quoting '942 Patent col. 6 l. 25, 54–55; '277 Patent col. 6 l. 33, 62–63).

At the outset, the Court rejects defendants' proposed construction. Limiting the construction of "scaphal mold" to "mold for scapha" ignores numerous statements in the Patents that the scaphal mold also molds the helix and helical rim. *See, e.g.*, '942 Patent col. 6 l. 24–26 ("ear molding device [] is configured to mold the scaphoid fossa, helix, and the helical rim"); '277 Patent col. 6 l. 65–66 (explaining the ear molding device "correct[s] the shape of the helix, helical rim, and/or scaphoid fossa"). Furthermore, the Patents explain the reshaping of the scapha, helix, and helical rim as a function of *both* the "scaphal mold" and the "one or more braces" *together*—not the scaphal mold alone. *See, e.g.*, '277 Patent col. 10 l. 45–49 ("the one or more braces and the scaphal mold are adapted to . . . maintain a substantially correct anatomical shape of the helix and the helical rim"). Finally, the parties agree that the scaphal mold does not have to physically touch the skin of the scapha. *See* Pls. Reply 8–9; Defs. Sur-Reply 1–2. For these reasons, defendants' proposed construction misrepresents the scaphal mold.

Moreover, defendants' construction runs counter to the doctrine of claim differentiation. The doctrine of claim differentiation provides that "the presence of a dependent claim that adds a

particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *See Phillips*, 415 F.3d at 1315; *see also Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) ("Claim differentiation is a guide, not a rigid rule."). This doctrine stems from "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005). The rebuttable presumption created by claim differentiation is at its strongest "when the limitation in dispute is the only meaningful difference between an independent and dependent claim." *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

In this case, Claim 1 states that the scaphal mold works with "one or more braces" to "maintain a substantially correct anatomical shape of the *helix and helical rim*" but does not mention reshaping the scapha. *See* '277 Patent col. 10 l. 45–49 (emphasis added); '942 Patent col. 10 l. 28–30 (emphasis added). Claim 9 of the '942 Patent and Claim 16 of the '277 Patent state that the "scaphal mold includes a generally arc-shaped semi-cylindrical extension . . . [which] is [adapted] to maintain a substantially anatomical shape *of the scaphal area* of the ear." '277 Patent col. 12 l. 12–16 (emphasis added); '942 Patent col. 10 l. 59–63 (emphasis added). The fact that Claims 9 and 16 are the first mention in the claims of reshaping the scaphal area "makes it likely that the patentee did not contemplate" that that limitation was "already contained" in the independent claim, Claim 1. *See Phillips*, 415 F.3d at 1324. For these reasons, the Court rejects defendants' construction of "scaphal mold."

The Court construes "scaphal mold" to mean "mold at the end of the one or more braces that is positionable in the scaphal area." This construction best describes the way "scaphal mold" is used in the Patents. As stated *supra*, the Patents provide that the scaphal mold is always

at the end of the "one or more braces," and that, together, the scaphal mold and the braces mold the helix, helical rim, and/or scapha. The Court rejects defendants' argument that this construction reads the word "scaphal" out of the term "scaphal mold." *See* Defs. Resp. 3. In this construction, "scaphal" refers to which side of the ear the scaphal mold is placed—in the scaphal area.

For these reasons, "scaphal mold" is construed to mean "mold at the end of the one or more braces that is positionable in the scaphal area."

### C. "Cradle" in '277 Patent

Finally, the Court must construe "cradle." The parties propose the following constructions:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction is necessary. Alternatively: "The base section and the cover" | "Support with a surrounding wall" |

The term "cradle" is used in the '277 Patent. For example, claim 1 provides:

> a *cradle* comprising:
> > a base section defining an opening dimensioned to accommodate the passage of the ear through the opening, the base section including a posterior surface and an anterior surface;
> > a cover releasably engageable with the base section, wherein the cover, when engaged with the base section, defines a compartment between an inner surface of the cover and an inner surface of the base section;

'277 Patent col. 10 l. 32–40 (emphasis added).

First, plaintiffs contend no construction is necessary. *See* Pls. Op. Br. 15. Defendants argue that the construction of "cradle" is relevant to their non-infringement defense, because InfantEar does not have a "cradle." *See* Defs. Sur-Reply 1. The Court agrees that the construction of "cradle" is relevant to defendants' non-infringement position and will construe that claim term.

Alternatively, plaintiffs argue that the claims of the '277 Patent provide the construction

13

for "cradle," which is "the base section and the cover." Pls. Op. Br. 15. Defendants contend that the construction of "cradle" should be "support with a surrounding wall." Defs. Resp. 12.

The Court concludes that the intrinsic evidence supports plaintiffs' definition. Multiple provisions of the '277 Patent describe the cradle as being the base section and the cover. For example, Claim 1 provides, "a cradle comprising: a base section . . . [and] a cover." '277 Patent col. 10 l. 32–40; *see also* '277 Patent col. 4 l. 42–43 ("Cradle [] has a cradle base [] and a cradle cover 22."). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention.'" *See Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1115); *cf. Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) (explaining where the "patentee explicitly defines a claim term in the patent specification, the patentee's definition controls"). The claims and language of the '277 Patent define "cradle" as the combination of the base section and the cover.

The doctrine of claim differentiation further buttresses plaintiffs' construction. Claim 1 makes no mention of a wall, whereas Claim 10 of the '277 Patent states, "The molding system of claim 1, wherein the base section and the cover include a vertical wall." '277 Patent col. 11 l. 17–18. Dependent Claim 10 thus adds the limitation of a "vertical wall," and it would be inappropriate to read that limitation into Claim 1. Defendants argue that the limitation added by Claim 10 is an embodiment in which *both* the cover and the base section feature a wall. *See* Markman Hr'g Tr. 100:22–101:6. Defendants offer no support for this interpretation, and the Court rejects defendants' argument.

Defendants next point to the specification of the '277 Patent as support for their construction. *See* Defs. Resp. 14. The specification provides that the base section "includes a rim (wall) [] forming the wall of the compartment in which the ear is positioned to correct

14

deformities." '277 Patent col. 5 l. 39–41. Although this language constitutes some evidence that the cradle may include a wall, it merely describes a preferred embodiment of the Patent. *See* '277 Patent col. 4 l. 39. "[O]ne of the cardinal sins of patent law . . . [is] reading a limitation from the written description into the claims." *See Phillips*, 415 F.3d at 1319–20 (quoting *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Id.* at 1323. The '277 Patent makes clear that there may be embodiments of the device other than the preferred embodiments described, stating, "A number of implementations have been described. Nevertheless, it will be understood that various modifications may be made. For example, the size and shape of various components may be altered . . . ." *See* '277 Patent col. 10 l. 18–22. Thus, the Court rejects that the cradle must include a wall in every potential embodiment.

Moreover, defendants' extrinsic evidence does not change the Court's conclusion. Defendants argue that "cradle" has a common dictionary definition: "[a] baby's bed or cot, typically one mounted on rockers." Defs. Resp. 13. Based on this definition, defendants argue that, just like a baby's cradle needs a surrounding wall to prevent the baby from falling out, so too must the construction of "cradle" in the '277 Patent include a surrounding wall. *Id.* The Court concludes that defendants' analogy to a different type of cradle is insufficient to overcome intrinsic evidence setting forth a unique definition for cradle: base section and cover.

In addition, defendants argue that the cradle must be something more than a bottom and top section, because plaintiffs' U.S. Patent No. 8,136,530 ("'530 Patent"), which predates the '277 Patent, describes a bottom section and a top section but does not refer to those components as a "cradle." *Id.* at 15–16. According to defendants, the argument that the cradle is unique to

15

the '277 Patent is bolstered by the Patent Examiner's notes in the '277 Patent Notice of Allowance, which provide that "the prior art fails to fairly teach or suggest a molding system comprising a cradle having a base section to accommodate the human ear and a cover releasably engageable with the base section in combination with an ear molding device having one or more braces and a scaphal mold to retain the helix and helical rim." *Id.* at 18. Defendants contend that these notes reveal that the addition of a cradle was key in the Patent Examiner's decision that there was no prior art. *Id.*

The Court disagrees with defendants on this issue. The Patent Examiner's notes emphasize the "combination" of the cradle and the "ear molding device"—in other words, what is covered by the '277 Patent—not merely the term "cradle." Moreover, the difference in language between the '530 Patent and '277 Patent is insufficient to overcome the ample intrinsic evidence reflecting the use of the term "cradle" in the '277 Patent to mean the base section and the cover.

For these reasons, "cradle" is construed as "the base section and the cover."

## V. CONCLUSION

For the foregoing reasons, the Court construes the disputed claim terms as follows:

1. "**Opening**," as used in the '277 Patent, means "a gap";

2. "**Scaphal mold**," as used in the '942 Patent and the '277 Patent, means "mold at the end of the one or more braces that is positionable in the scaphal area";

3. "**Cradle**," as used in the '277 Patent, means "the base section and the cover."

An appropriate Order follows.

16